UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COASTAL ENVIRONMENTAL RIGHTS FOUNDATION,<br><br>                                        Plaintiff,<br><br>v.<br><br>AZTEC PERLITE COMPANY, INC.,<br><br>                                        Defendant. | Case No.:  24-cv-385-RSH-SBC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF COASTAL ENVIRONMENTAL RIGHTS FOUNDATION'S MOTION FOR DEFAULT JUDGMENT**<br><br>[ECF No. 18] |

Plaintiff Coastal Environmental Rights Foundation initiated the instant action against Defendant Aztec Perlite Company, Inc. alleging that Defendant operates a perlite manufacturing facility that discharges pollutant-contaminated storm water in violation of the Clean Water Act ("CWA"). Default has been entered against Defendant. ECF No. 16. Before the Court is Plaintiff's motion for default judgment. ECF No. 18. Pursuant to Local Civil Rule 7.1(d)(1), the Court finds the matter presented appropriate for resolution without oral argument. For the reasons below, the Court grants in part and denies in part Plaintiff's motion.

///

///

# I.   BACKGROUND

## A.   Factual Background

### 1.   *The CWA and California's General Permit*

The CWA was enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act "prohibits 'the discharge of any pollutant by any person' into the waters of the United States without a National Pollutant Discharge Elimination System ('NPDES') permit." *Puget Soundkeeper All. v. Port of Tacoma*, 104 F.4th 95, 99 (9th Cir. 2024) (quoting 33 U.S.C. § 1311(a)); *see Saint John's Organic Farm v. Gem Cnty. Mosquito Abatement Dist.*, 574 F.3d 1054, 1061 (9th Cir. 2009) ("[T]he CWA achieves [its] goal by forbidding or minimizing pollution through the NPDES permitting process."). "If a discharger is covered by a NPDES permit and complies with that permit, the permit 'shields' it from liability under the CWA, even if [the Environmental Protection Agency ("EPA")] promulgates more stringent limitations over the life of the permit." *Alaska Cmty. Action on Toxics v. Aurora Energy Servs., LLC*, 765 F.3d 1169, 1171 (9th Cir. 2014). "However, any violation of the permit's terms constitutes a violation of the CWA." *Id.*

"NPDES permits come in two varieties: individual and general." *NRDC v. United States EPA*, 279 F.3d 1180, 1183 (9th Cir. 2002). "An individual permit authorizes a specific entity to discharge a pollutant in a specific place and is issued after an informal agency adjudication process." *Id.* "General permits, on the other hand, are issued for an entire class of hypothetical dischargers in a given geographical region and are issued pursuant to administrative rulemaking procedures." *Id.* "Once a general permit has been issued, an entity seeking coverage generally must submit a 'notice of intent' to discharge pursuant to the permit." *Alaska*, 765 F.3d at 1171.

"Much of the responsibility for administering the NPDES permitting system has been delegated to the states." *WaterKeepers N. Cal. v. AG Indus. Mfg.*, 375 F.3d 913, 915 (9th Cir. 2004) (citing 33 U.S.C. § 1342(b) and Cal. Water Code § 13370). Pursuant to this delegated authority, the California State Water Resources Control Board ("Water

Board") issued California's General Permit for Storm Water Discharges Associated with Industrial Activities ("General Permit"). *See Cal. Sportfishing Prot. All. v. Chico Scrap Metal, Inc.*, 728 F.3d 868, 871 (9th Cir. 2013).[1] The General Permit was amended in 2015 and 2018, with these amendments taking effect on July 1, 2020. ECF No. 18-1 at 6.[2]

### 2. The Aztec Facility

Plaintiff makes the following allegations in its Complaint, ECF No. 1 ("Compl."), which the Court assumes to be true in considering Plaintiff's default judgment motion. *See Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977).

Defendant is a suspended California corporation that owns and operates a perlite manufacturing, packaging, and distribution facility (hereinafter, the "Aztec Facility") located in Escondido, California. Compl. ¶¶ 15, 17, 88. On July 31, 2025, Defendant obtained coverage under the General Permit to conduct industrial operations at the Aztec Facility. *Id.* ¶ 82. On October 30, 2023, the Water Board terminated Defendant's enrollment for failure to pay annual fees. *Id.* ¶ 85.

Industrial materials are handled at various locations throughout the Aztec Facility "either outdoors without adequate cover" or "without adequate secondary containment" or other "adequate treatment measures to prevent polluted storm water and non-storm water from being discharged." *Id.* ¶ 92. Pollutants therefore "regularly escape" from the Aztec Facility "via spills, dust emissions, wind dispersion, vehicle track out" or other means. *Id.* ¶ 93. Plaintiff's monitoring data, taken on March 28, 2022 and December 11,

---

[1] Per the default judgment motion, the General Permit is available online at https://www.waterboards.ca.gov/water_issues/programs/stormwater/igp_20140057dwq.html (last accessed October 16, 2024). To properly consider Plaintiff's motion, the Court *sua sponte* takes judicial notice of the General Permit as a "quasi-judicial, public document[] of a state agency whose accuracy cannot be reasonably questioned." *San Diego Coastkeeper v. Pick-Your-Part Auto Wrecking*, No. 22-CV-1693 TWR (DDL), 2023 U.S. Dist. LEXIS 132675, at *14 (S.D. Cal. July 31, 2023).

[2] All citations to electronic case filing ("ECF") entries refer to the ECF-generated page numbers.

2022, "demonstrates" the Aztec Facility's storm water discharges include "concentrations of iron, manganese, nitrate and nitrite ['N+N'], and pH-affecting substances." *Id.* ¶ 109; ECF No. 1-2 at 9. All discharges from the Aztec Facility flow into Escondido Creek, San Elijo Lagoon, and then into the Pacific Ocean (collectively, "Receiving Waters"). Compl. ¶ 91.

**B.    Procedural History**

On February 27, 2024, Plaintiff filed its Complaint in this action under the citizen suit enforcement provision of the CWA.[3] Plaintiff alleges Defendant has discharged pollutant-contaminated storm water in violation of the CWA and the requirements of the General Permit since at least November 1, 2018. *Id.* ¶¶ 122, 130, 140, 145–46, 161.

More specifically, Plaintiff brings causes of action for: (1) failure to maintain coverage under a valid NPDES Permit; (2) violation of the General Permit's discharge prohibitions; (3) violation of the General Permit's effluent limitations; (4) failure to adequately develop, implement, or revise a Storm Water Pollution Prevention Plan ("SWPPP"); (5) failure to adequately develop, implement, or revise a Monitoring Implementation Plan ("MIP"); (6) failure to properly monitor storm water discharges; and (7) failure to submit accurate and complete annual reports. *Id.* ¶¶ 163–214. Defendant filed an Answer on April 3, 2024. ECF No. 5.

On June 6, 2024, the Court granted Lounsbery Ferguson Altona & Peak LLP's ("LFAP") motion to withdraw as Defendant's counsel of record. ECF No. 10. The Court ordered Defendant to obtain new counsel, pursuant to Local Civil Rule 83.3(j), and to

---

[3]    The CWA "provides for citizen enforcement suits." *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1519 (9th Cir. 1987) (citing 33 U.S.C. § 1365). "A citizen may bring an action against any person who is alleged to be in violation of an effluent standard or limitation or an order issued by the EPA or a state agency." *Id.* (citing 33 U.S.C. § 1365(a)).

have this counsel enter a notice of appearance by July 3, 2024.[4] *Id.* at 3. Per the Court's Order, LFAP filed a proof of service confirming that it had served the withdrawal order on Defendant via e-mail on June 6, 2024. ECF No. 11.

On July 15, 2024, the Court issued an Order to Show Cause ("OSC") why Defendant's Answer should not be struck and default entered against it for failure to obtain new counsel. ECF No. 14. The Court again directed Defendant to obtain new counsel and to have counsel enter a notice of appearance and respond by way of a written brief by July 29, 2024. *Id.* at 3. A copy of the OSC was mailed to Defendant's provided address. *Id.*

On July 30, 2024, in light of Defendant's failure to follow the Court's orders, the Court struck Defendant's Answer and directed the Clerk of Court to enter default against Defendant pursuant to Federal Rule of Civil Procedure 55(a). ECF Nos. 15 at 1; 16. On August 5, 2024, Plaintiff moved for default judgment against Defendant. ECF No. 18.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 55 permits a court to enter default judgment upon a party's application. The entry of default judgment is a two-step process. *Eitel v. McCool*, 782 F.2d 1470, 1471 (9th Cir. 1986). "First, a party must obtain a clerk's entry of default under Rule 55(a)[.]" *Verbick v. Movement Tech. Co.*, No. 20-CV-611 TWR (DEB), 2023 U.S. Dist. LEXIS 106778, at *2 (S.D. Cal. Mar. 7, 2023) (internal quotation marks omitted omitted). "The first step, entry of default, is a ministerial matter performed

---

[4]    Under Local Civil Rule 83.3(j), "[o]nly natural persons representing their individual interests in propria persona may appear in court without representation by an attorney permitted to practice pursuant to Civil Local Rule 83.3. All other parties, including corporations, partnerships and other legal entities, may appear in court only through an attorney permitted to practice pursuant to Civil Local Rule 83.3." It is "perfectly appropriate" for a district court to enter default judgment against a corporation that fails to retain counsel. *United States v. High Country Broad. Co.*, 3 F.3d 1244, 1245 (9th Cir. 1993); *see Emp. Painters' Tr. v. Ethan Enterprises, Inc.*, 480 F.3d 993, 998 (9th Cir. 2007) ("We have recognized default as a permissible sanction for failure to comply with local rules requiring representation by counsel.").

by the clerk and is a prerequisite to a later default judgment." *Faunce v. Martinez*, No. 21-cv-363-MMA (WVG), 2022 U.S. Dist. LEXIS 216308, at *5 (S.D. Cal. Nov. 30, 2022) (internal quotation marks omitted). Second, upon entry of default, a party must file a motion for default judgment. *Verbick*, 2023 U.S. Dist. LEXIS 106778, at *2. Although default judgments are ordinarily disfavored, a court may grant or deny a motion for default judgment at its discretion. *Eitel*, 782 F.2d at 1471–72.

## III.   ANALYSIS

### A.   Prerequisites to Entering Default Judgment

"When entry of judgment is sought against a party who has failed to plead or otherwise defend, a district court has an affirmative duty to look into its jurisdiction over both the subject matter and the parties." *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999). "Before the Court considers whether to enter default judgment, it must be satisfied that the procedural prerequisites, including subject matter jurisdiction, personal jurisdiction, and adequate service of process, have been met." *Tecnologias Avanzadas RD, SRL v. Riegler*, No. 16-cv-06701-EDL, 2017 U.S. Dist. LEXIS 98593, at *5 (N.D. Cal. June 1, 2017)). The Court addresses these prerequisites below.

#### 1.   *Subject Matter Jurisdiction*

Federal subject matter jurisdiction in civil cases exists where: (1) the requirements for diversity jurisdiction are met, or (2) the complaint involves a federal question. *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987) ("Absent diversity of citizenship, federal-question jurisdiction is required."); *see* 28 U.S.C. §§ 1331–32. The Court has federal question subject matter jurisdiction over Plaintiff's CWA claims. *See Ecological Rights Found. v. PacifiCorp*, No. 23-cv-05179-JST, 2024 U.S. Dist. LEXIS 112772, at *6 (N.D. Cal. June 26, 2024) (holding that the court had federal question jurisdiction over plaintiff's citizen enforcement suit under the CWA); *Remington v. Mathson*, No. CV 09-4547 NJV, 2010 U.S. Dist. LEXIS 29187, at *19 (N.D. Cal. Mar. 26, 2010) ("The Court has federal question jurisdiction over this action based on Plaintiff's federal environmental claims under RCRA, CWA, CERCLA, and EPCRA."); *Cmty. Ass'n for*

*Restoration of the Env't v. Henry Bosma Dairy*, 65 F. Supp. 2d 1129, 1134 (E.D. Wash. 1999) ("The claimed violations of the CWA present a federal question and give the Court jurisdiction under 28 U.S.C. § 1331.").

The Court must also consider whether Plaintiff complied with the CWA's notice requirement. *See Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 995 (9th Cir. 2000) ("If a party seeking to bring a citizen enforcement action has not complied with the CWA's notice requirement, then the district court in which that action is brought lacks subject matter jurisdiction and must dismiss the action."). "For a federal court to exercise subject matter jurisdiction over a private CWA claim, the individual or entity bringing the claim 'must give a 60-day notice of intent to sue.'" *Cottonwood Env't L. Ctr. v. Edwards*, 86 F.4th 1255, 1263 (9th Cir. 2023) (quoting *Ctr. for Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 800 (9th Cir. 2009)).

Pursuant to 40 C.F.R. § 135.3(a):

> Notice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

"The regulation does not require . . . that plaintiffs list every specific aspect or detail of every alleged violation." *S.F. Baykeeper v. Tosco Corp.*, 309 F.3d 1153, 1158 (9th Cir. 2002) (internal quotation marks omitted). "Notice is sufficient if it is specific enough to give the accused company the opportunity to correct the problem." *Id.*

In this case, Plaintiff sent a notice of intent to sue letter to Defendant on November 28, 2023. ECF No. 1-2 at 1. Plaintiff's letter identified the alleged pollutants being discharged by Defendant and their source, and described each of Defendant's alleged violations of the CWA and General Permit, including a range of dates for these violations. *See* ECF No. 1-2 at 5–23. The Court concludes Plaintiff's letter sufficiently

fulfills the CWA's notice requirement. *See S.F. Baykeeper*, 309 F.3d at 1155 ("As long as a notice letter is reasonably specific as to the nature and time of the alleged violations, the plaintiff has fulfilled the notice requirement.").

For the above reasons, the Court concludes the requirements for federal question subject matter jurisdiction under the CWA have been met in this case.

### 2.   Standing

The Court next considers Plaintiff's standing to sue. Standing is an "indispensable part" of a plaintiff's case and "must be supported at each stage of litigation in the same manner as any other essential element of the case." *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002). An organization can bring suit in federal court under two theories of standing: by suing on its own behalf, or on behalf of its members. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 723 (9th Cir. 2023).

Here, Plaintiff brings this suit on behalf of its members. ECF No. 20 at 2. "An organization has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (internal quotation marks omitted). The Court considers each of these factors below.

### a.   Standing of Individual Members

Individual members of the organization have standing to sue in their own right when they have "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

///

Here, Plaintiff has sufficiently demonstrated an "injury in fact." "The 'injury in fact' requirement in environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct." *Ecological Rights*, 230 F.3d at 1147. "In an environmental case, the 'relevant showing . . . is not injury to the environment but injury to the plaintiff." *Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 826, 832 (9th Cir. 2021).

Plaintiff submits the declaration of one of its members, David Drewelow, who states that he has owned and operated a business with a "direct view" of the Aztec Facility since 2002. Declaration of David Drewelow ("Drewelow Decl.," ECF No. 20-1) ¶ 3. According to Mr. Drewelow, perlite emitted from the Aztec Facility regularly falls on his business property, equipment, and surrounding buildings, cars, roads, and gutters. *Id.* ¶¶ 4–5. Mr. Drewelow declares he also lives nearby in Encinitas and frequents the San Elijo Lagoon and beach near the lagoon, but is deterred from fully enjoying these areas in light of his concerns regarding the pollutants coming from the Aztec Facility. *Id.* ¶¶ 7–8, 10–11. These factual averments are sufficient to establish an injury in fact. *See Ecological Rights Found.*, 230 F.3d at 1150 (holding organization had standing to sue where members "use[d] the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity").

Second, Mr. Drewelow's injury is "fairly traceable" to Defendant's actions. "An injury is fairly traceable to a challenged action as long as the links in the proffered chain of causation 'are not hypothetical or tenuous and remain plausib[le].'" *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 943 (9th Cir. 2021) (quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011)). Here, Plaintiff has clearly alleged Defendant violated the CWA and the General Permit by discharging pollutant-contaminated storm water. As noted above, Mr. Drewelow states his enjoyment of activities taking place near Escondido Creek, the San Elijo Lagoon, and the beach near the lagoon have been negatively affected by these alleged violations. This is sufficient to establish the

causation element. *See Ecological Rights*, 230 F.3d at 1152.

Finally, Plaintiff has sufficiently shown the injuries of its members could likely be redressed by a favorable decision. "[A] plaintiff can meet the redressability requirement by showing that it is likely, although not certain, that his injury can be redressed by a favorable decision." *Ass'n of Irritated Residents*, 10 F.4th at 944. Here, "[s]hould the court find that [Defendant] failed to comply with the CWA, and impose civil penalties, it is well established that would sufficiently redress the injuries of which [Plaintiff] complains." *Cal. Coastkeeper All. v. Cosumnes Corp.*, No. 2:20-cv-1703 DB, 2023 U.S. Dist. LEXIS 143369, at *13 (E.D. Cal. Aug. 16, 2023) (internal quotation marks omitted); *see Laidlaw*, 528 U.S. at 186 (civil penalties "encourage defendants to discontinue current violations and deter them from committing future ones" thereby "afford[ing] redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct.").

### b.   Germane to Organization's Purpose

Plaintiff has also sufficiently demonstrated the interests it seeks to protect in this action are germane to the organization's purpose. Plaintiff Coastal Environmental Rights Foundation is a non-profit corporation established "to advocate for the protection and enhancement of coastal natural resources and the quality of life for coastal residents." Compl. ¶ 18. The discharges from the Aztec Facility are alleged to flow into Escondido Creek, the San Elijo Lagoon, and then into the Pacific Ocean. *Id.* ¶ 91. The protection of these waters is clearly germane to Plaintiff's purpose.

### c.   Participation of Individual Members

Finally, the Court finds no reason to require the participation of Plaintiff's individual members in this suit. The relief Plaintiff seeks—in the form of civil penalties, declaratory judgment, and an injunction—do not require the participation of Plaintiff's individual members. *See Associated Gen. Contractors of Am. v. Metro. Water Dist.*, 159 F.3d 1178, 1181 (9th Cir. 1998) ("Individualized proof from the members is not needed where, as here, declaratory and injunctive relief is sought rather than monetary

damages."); *S.F. Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 752 (N.D. Cal. 2011) ("Where, as here, associational plaintiffs do not seek individualized relief for their members that would require individualized proof, the participation of individual members is not required.").

### d.    Conclusion

For the above reasons, the Court concludes Plaintiff has sufficiently established it has standing to pursue this suit.

### 3.    Personal Jurisdiction

The Court next considers whether it may exercise personal jurisdiction over Defendant. *See Veeck v. Commodity Enters., Inc.*, 487 F.2d 423, 426 (9th Cir. 1973) ("The district court's lack of *in personam* jurisdiction over the appellants renders void its default judgment against them."). Here, because Defendant is a California corporation (albeit suspended) with a physical address in California, the Court is satisfied it may exercise personal jurisdiction over Defendant. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) (citing domicile, place of incorporation, and principal place of business as bases for the exercise of personal jurisdiction over corporations); *FFM Mushrooms Inc. v. Rain Forest Produce Inc.*, No. 20-cv-08201-VKD, 2021 U.S. Dist. LEXIS 131315, at *5 (N.D. Cal. June 3, 2021) ("A district court may exercise general personal jurisdiction over a corporation that is incorporated or has its principal place of business in the state where the district court is located."); *Feiya Cosmetics, LLC v. Beyond Beauty Int'l, LLC*, No. C-10-00967 JCS, 2011 U.S. Dist. LEXIS 111769, at *17 (N.D. Cal. Aug. 29, 2011) (holding court had personal jurisdiction over a suspended California corporation with a physical address in California).

### 4.    Service of Process

As a final procedural prerequisite, the Court evaluates whether Defendant was properly served. *See Folkmanis, Inc. v. Uptown Toys LLC*, No. 18-cv-00955-EMC, 2018 U.S. Dist. LEXIS 156569, at *4 (N.D. Cal. Sep. 13, 2018) ("In deciding whether to grant or deny default judgment, the Court must first assess the adequacy of the service of

process on the party against whom default is requested because, if service were improper, that may well explain the failure of a defendant to appear in a lawsuit.") (internal quotation marks omitted).

Under Federal Rule of Civil Procedure 4(h)(1), a corporation may be served "in the manner prescribed by Rule 4(e)(1) for serving an individual" or "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process[.]" Fed. R. Civ. P. 4(h)(1). Federal Rule of Civil Procedure 4(e)(1), in turn, allows for service by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." Fed. R. Civ. P. 4(e)(1). Under California law, a corporation may be served by delivering a copy of the summons and complaint to the person designated as agent for service of process. Cal. Civ. Proc. Code § 416.10(a).

Here, Plaintiff's proof of service indicates Defendant was served via its registered agent for service of process. ECF No. 4. This is sufficient for the Court to find Defendant was properly served in this case. *See Bay Bread, LLC v. Lemonade Rest. Grp., LLC*, No. 3:21-cv-02979-JD, 2023 U.S. Dist. LEXIS 20493, at *3 (N.D. Cal. Feb. 7, 2023) (corporate defendant properly served through registered agent for service of process); *Rapid Growth Tech. SDN Bhd. v. Kraco Enter., LLC*, No. CV 18-3850-MWF (Ex), 2018 U.S. Dist. LEXIS 245001, at *4 (C.D. Cal. Dec. 21, 2018) (same).

**B.    Entry of Default Judgment**

Having determined the prerequisites for entering default judgment have been met, the Court turns to the merits of Plaintiff's motion.

///

///

///

///

///

The decision to grant or deny default judgment lies within the discretion of the district court. *Eitel*, 782 F.2d at 1471. The Ninth Circuit has enumerated seven factors—known as the *Eitel* factors—that a court may consider when exercising its discretion:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Id.* at 1471–72. The Court addresses each of the *Eitel* factors below.

### 1.   Factor I: Possibility of Prejudice to Plaintiff

The first *Eitel* factor evaluates whether a plaintiff will suffer prejudice if default judgment is not entered. Here, because Defendant has not retained counsel, litigation in this case cannot continue. Absent a default judgment, Plaintiff would likely be without recourse. Defendant could avoid liability by simply not retaining new counsel. The first *Eitel* factor, therefore, weighs in favor of granting default judgment. *See Williams v. La Perla N. Am., Inc.*, No. 3:23-cv-01633-JSC, 2024 U.S. Dist. LEXIS 81697, at *6 (N.D. Cal. May 2, 2024) (reasoning plaintiff would suffer prejudice in absence of default judgment where defendant had failed to obtain substitute counsel); *Baker v. Wehinger*, No. CV 18-5800-DMG (Ex), 2022 U.S. Dist. LEXIS 175611, at *5 (C.D. Cal. Sep. 27, 2022) (same); *SEC v. Blockvest, LLC*, No. 18CV2287-GPB(MSB), 2020 U.S. Dist. LEXIS 154988, at *6 (S.D. Cal. Aug. 26, 2020) (same).

### 2.   Factors II and III: Merits of Plaintiff's Substantive Claim and Sufficiency of the Complaint

The second and third *Eitel* factors focus on the sufficiency of Plaintiff's Complaint. "To warrant entering a default judgment, a complaint's allegations must be sufficient to state a claim upon which relief can be granted." *Talavera Hair Prods. v. Taizhou Yunsung Elec. Appliance Co.*, No. 18-CV-823 JLS (JLB), 2021 U.S. Dist. LEXIS 149179, at *32 (S.D. Cal. Aug. 6, 2021) (citing *Danning v. Lavine*, 572 F.2d 1386, 1388

(9th Cir. 1978)). A complaint satisfies this standard when the claims cross the "line from conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (internal quotation marks omitted). "A party seeking default judgment bears the burden of demonstrating to the Court that the complaint is sufficient on its face and that the *Eitel* factors weigh in favor of granting default judgment." *Verbick*, 2023 U.S. Dist. LEXIS 106778, at *3–4 (internal quotation marks omitted). In a default judgment context, "the general rule is that well-pled allegations in the complaint regarding liability are deemed true." *Fair Hous. v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002). A court "is not required to make detailed findings of fact." *Id.*

### a.    Claim 1: Failure to Maintain Coverage

"Section 301(a) of the CWA prohibits the discharge of any pollutant from any point source into navigable waters unless the discharge complies with certain other sections of the CWA." *NRDC v. Cnty. of L.A.*, 725 F.3d 1194, 1198 (9th Cir. 2013). "One of those sections is section 402, which provides for the issuance of NPDES permits." *Id.* "In nearly all cases, an NPDES permit is required before anyone may lawfully discharge a pollutant from a point source into the navigable waters of the United States." *Id.* California's General Permit covers industrial dischargers. *See S.F. Baykeeper*, 309 F.3d at 1156. "Industrial facilities in California must either comply with the requirements of the General Permit or obtain an individualized NPDES permit allowing a variance." *Id.*

Here, Plaintiff alleges Defendant has discharged and continues to discharge polluted storm water from the Aztec Facility into Escondido Creek, Olivenhain Dam and Reservoir, San Dieguito Reservoir, San Dieguito River, San Elijo Lagoon, and the Pacific Ocean without an NPDES permit. Compl. ¶ 165; ECF No. 1-2 at 3 ("Escondido Creek is the waterbody nearest the [Aztec Facility]. Escondido Creek flows into the San Elijo Lagoon and eventually the Pacific Ocean.").[5] According to Plaintiff, Defendant obtained

---

[5]    The Court may consider Plaintiff's November 28, 2023 notice of intent to sue letter in considering the merits of Plaintiff's claims. *See Durning v. First Bos. Corp.*, 815 F.2d

coverage under the General Permit on July 31, 2015, but allowed its enrollment to lapse on October 30, 2023, after Defendant failed to pay the required annual fees. *Id.* ¶¶ 82, 85. Plaintiff has sufficiently pleaded a claim against Defendant for the discharge of pollutants from a point source into navigable waters without an NPDES permit. [6]

> b.   *Claim 2: Violation of Discharge Prohibitions*

California's General Permit outlines several prohibitions regarding industrial storm water and non-storm water discharges. First, under Section III.B of the General Permit, "discharges of liquids or materials other than storm water, either directly or indirectly to waters of the United States, are prohibited unless authorized by another NPDES permit." General Permit § III.B; Compl. ¶ 41. Second, Section III.C prohibits "[i]ndustrial storm water discharges and authorized [non-storm water discharges] that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance[.]" General Permit § III.C; Compl. ¶ 42. Finally, Section III.D prohibits discharges that "violate any discharge prohibitions contained in applicable Regional Water Board Water Quality Control Plans (Basin Plans), or statewide water quality control plans and policies[.]" General Permit §

---

1265, 1267 (9th Cir. 1987) ("If a complaint is accompanied by attached documents, the court is not limited by the allegations contained in the complaint. These documents are part of the complaint and may be considered in determining whether the plaintiff can prove any set of facts in support of the claim.").

[6]    The "discharge of a pollutant" is defined by the CWA to mean "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

A "point source" is defined as "any discernible, confined and discrete conveyance...from which pollutants are or may be discharged." *Id.* § 1362(14).

The term "pollutant" is defined as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." *Id.* § 1362(6).

Finally, the CWA defines "navigable waters" to mean the "waters of the United States." 33 U.S.C. § 1362(7). The "waters of the United States" encompasses "only those relatively permanent, standing or continuously flowing bodies of water forming geographic[al] features that are described in ordinary parlance as streams, oceans, rivers, and lakes." *Sackett v. EPA*, 598 U.S. 651, 671 (2023).

III.D; Compl. ¶ 43.

Here, Plaintiff alleges Defendant has discharged pollutants in violation of Sections III.B, III.C and III.D of the General Permit. Compl. ¶¶ 175–77. Specifically, Plaintiff alleges storm water monitoring data—collected on March 28, 2022 and December 11, 2022—demonstrates the Aztec Facility discharged and continues to discharge "concentrations of iron, manganese, [N+N], and pH-affecting substances[.]" *Id.* ¶ 109; ECF No. 1-2 at 8. According to Plaintiff, these discharges are: (1) not authorized by an NPDES permit in violation of Section III.B; (2) cause or threaten to cause pollution, contamination, or nuisance in violation of Section III.B; and (3) in excess of the water quality objectives set forth in the San Diego Basin Plan in violation of Section III.C. Compl. ¶¶ 109–11.

The Court determines the above allegations are sufficient to plead plausible violations of Sections III.B, III.C and III.D of the General Permit. *See Ctr. for Cmty. Action & Env't Just. v. Friends of Riverside Airport, LLC*, No. EDCV 17-1091 JGB (KKx), 2017 U.S. Dist. LEXIS 232218, at *36 (C.D. Cal. Sep. 28, 2017) ("A plausible violation of [defendant's] General Permit conditions can [] be inferred from its alleged discharge of [chemicals] into surrounding waterways."); *see also San Diego Coastkeeper*, 2023 U.S. Dist. LEXIS 132675, at *38–39 (plaintiff plausibly alleged CWA violations based on at least one discharge prohibition under the General Permit in light of allegations of fluid spills and leaks mobilized by storm water).

### c.   Claim 3: Violation of Effluent Limitations

"Every NPDES permit must set forth effluent limitations that is, certain restriction[s] . . . on [the] quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters." *Food & Water Watch v. United States EPA*, 20 F.4th 506, 510 (9th Cir. 2021) (internal quotation marks omitted). "The effluent limitations and the guidelines have long been understood to be determined according to the best available or practicable technology." *Our Children's Earth Found. v. EPA*, 527 F.3d 842, 848 (9th Cir. 2008).

Under the General Permit, facility operators must "reduce or prevent discharges of pollutants in their storm water discharge" through the implementation of "Best Management Practices" ("BMPs") that employ the "Best Available Technology Economically Achievable" ("BAT") for toxic pollutants and the "Best Conventional Pollutant Control Technology" ("BCT") for conventional pollutants. General Permit § V.A Compl. ¶ 46; *see Nat. Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency*, 863 F.2d 1420, 1424 (9th Cir. 1988). The General Permit incorporates a "multiple objective performance measurement system that includes" Numeric Action Levels ("NALs"). General Permit § I.N. NALs "are numeric parameters for common stormwater pollutants established based on either the benchmark values in the EPA's 2008 Multi-Sector General Permit for Stormwater Discharges or previously gathered California industrial storm water discharge monitoring data." *Waterkeeper v. SSA Terminals, LLC*, 702 F. Supp. 3d 903, 920 (C.D. Cal. 2023); Compl. ¶ 49.

According to Plaintiff, sampling data of the Aztec Facility's storm water discharges shows Defendant exceeded EPA benchmarks for iron and N+N on March 28, 2022, and for iron and zinc on December 11, 2022. ECF No. 1-2 at 8, 25; 18-1 at 12. This is sufficient to make a plausible claim for violations of EPA's effluent limitations. *See Waterkeeper*, 702 F. Supp. 3d at 924 ("[A] defendant's alleged failure to comply with EPA benchmarks or NALs is relevant to assessing whether their treatment measures achieve BAT and BCT standards."); *Ctr. for Cmty. Action*, 2017 U.S. Dist. LEXIS 232218, at *37 ("Consistent exceedances of the EPA Benchmarks also plausibly allege [defendant's] FRA's failure to implement proper BATs/BCTs.").

### d.    Claim 4: SWPPP Deficiencies

Under the General Permit, dischargers must develop and implement a "site-specific SWPPP" for each facility covered by the permit. General Permit § X.A; *see Ecological Rights*, 230 F.3d at 1145. The SWPPPs must include, among other things: the facility name and contact information, a site map, a list of industrial materials, a description of potential pollutant sources, an assessment of potential pollutant sources, minimum BMPs,

advanced BMPs (if applicable), an MIP, an annual comprehensive facility compliance evaluation, the date the SWPPP was initially prepared, and the date of each SWPPP amendment (if applicable). General Permit § X.A; Compl. ¶ 67. Plaintiff submitted a SWPPP on July 31, 2015, and an "amended or updated" SWPPP on June 4, 2020. *Id.* ¶ 132.

Plaintiff alleges Defendant's SWPPPs are deficient for multiple reasons, including but not limited to, failing to include: (1) detailed information about Defendant's pollution prevention team; (2) an adequate description of potential pollutant sources; (3) a description of the Aztec Facility's industrial processes; (4) an adequate assessment of pollutant sources; (5) minimum BMPs; and (6) an adequate site map. *Id.* ¶¶ 134–39. For example, Plaintiff alleges the SWPPP's site map fails to "accurately reflect all drainage areas, discharge points, and flow direction" continues to describe these deficiencies with greater detail. *Id.* ¶ 139.

These allegations are sufficient to make a plausible claim for failure to comply with the General Permit's SWPPP requirements. *See Waterkeeper*, 702 F. Supp. 3d at 924 (finding similar allegations sufficient to plead a plausible claim for violation of SWPPP requirements); *Coastal Envtl.*, 2017 U.S. Dist. LEXIS 202649, at *39 (S.D. Cal. Dec. 8, 2017) (same).

### e. Claims 5: MIP Deficiencies

Under the General Permit, dischargers are required to prepare an MIP "in accordance with the requirements of the General Permit." General Permit § X.I. The MIP "shall include" a number of specific items, including an identification of team members assigned to conduct monitoring requirements and a description of discharge locations, visual observation procedures, and visual observation response procedures. *Id.*

Plaintiff contends Defendant has conducted and continues to conduct operations at the Aztec Facility "with an inadequately developed, implemented, and/or revised MIP." Compl. ¶ 147. Plaintiff similarly alleges that Defendant has failed "to develop and/or implement a MIP that requires the collection of storm water samples 'from each draining

area at all discharge locations' at the Facility in violation of the Industrial General Permit," citing the provision of the General Permit governing "Monitoring." *Id.* ¶ 152. Plaintiff could be alleging that Defendant: (1) did not prepare an MIP; (2) did prepare an MIP, but the contents of the MIP are deficient in some way; or (3) prepared an MIP that meets all the requirements of the General Permit, but has not properly implemented it. It is unclear from the Complaint—and Plaintiff does not specify in its briefing—which of these theories underlies Claim 5.

Nonetheless, the context in which Claim 5 is presented in the Complaint suggests that Plaintiff is alleging the last of these theories. The Complaint alleges a number of ways Defendant violated the General Permit's monitoring requirements. *Id.* ¶¶ 148–155 (failure to collect stormwater samples); 156–57 (failure to sample and test for pollutants); 158–59 (failure to conduct visual observations). Plaintiff's theory on Claim 5 therefore appears to be that Defendant failed to comply with the requirements for implementing an MIP by failing to monitor. But Defendant's alleged violations of the General Permit's monitoring requirement are already the subject of a different claim—Claim 6. If this is the crux of Claim 5, the Court is unable to determine—and Plaintiff has not adequately explained—how Claims 5 and 6 would not simply be repetitive articulations of the same failure to monitor. For the above reasons, the Court does not find Claim 5 sufficiently pleaded.

### f.   Claim 6: Failure to Monitor

Under the General Permit, dischargers are required to collect and analyze storm water samples from four qualifying storm events: two within the first half of each reporting year (July 1 to December 31) and two within the second half of each reporting year (January 1 to June 30) "from each drainage area at all discharge locations." General Permit §§ XI.B.2, XI.B.4. The samples must then be analyzed according to various parameters and the results submitted to the Water Board's Storm Water Multiple Application and Report Tracking System ("SMARTS"). *Id.* §§ XI.B.6, XI.B.11. Plaintiff alleges Defendant did not collect the required samples, analyze them, or upload the

results of this analysis to SMARTS as required. Compl. ¶¶ 202–204; ECF No. 1-2 at 19. This is sufficient to make a plausible claim for violation of the General Permit's monitoring requirements.

### g.    Claim 7: Failure to Report

The General Permit requires dischargers to certify and submit an annual report via SMARTS no later than July 15th "following each reporting year." General Permit § XVI.A. The Annual Report must include: (1) a checklist that indicates whether the discharger complied with and has addressed all applicable requirements of the General Permit; (2) an explanation for any non-compliance within the reporting year; (3) an identification of all revisions made to the SWPPP; and (4) the date(s) of the annual evaluation. *Id.* § XVI.B. According to Plaintiff, although Defendant certified and submitted five annual reports pursuant to the General Permit, each of Defendant's reports were improperly certified given Defendant's violation of numerous provisions of the General Permit. ECF No. 1-2 at 22–23. The Court concludes Plaintiff has adequately set forth a plausible claim for violation of the General Permit's annual reporting requirements.

### 3.    Factors IV: Sum of Money at Stake

Under the fourth *Eitel* factor, courts consider "whether the damages sought are proportional to the alleged harm." *Talavera*, 2021 U.S. Dist. LEXIS 149179, at *39. "Default judgment is disfavored where the sum of money at stake is too large or unreasonable in relation to defendant's conduct." *Vogel v. Rite Aid Corp.*, 992 F. Supp. 2d 998, 1012 (C.D. Cal. 2014).

Here, Plaintiff seeks civil penalties in the total amount of $11,997,000. ECF No. 18-1 at 24. Although this sum is significant, the Court has the discretion to reduce the amount of civil penalties imposed. *See Sw. Marine, Inc.*, 236 F.3d at 1001. The fourth *Eitel* factor is, therefore, neutral. *See G & G Closed Circuit Events LLC v. Halstead*, No. CV-20-02105-PHX-ESW, 2022 U.S. Dist. LEXIS 38621, at *7 (D. Ariz. Mar. 4, 2022) ("Where the Court has the discretion to reduce a plaintiff's requested monetary award,

the fourth *Eitel* factor becomes neutral."); *Twitch Interactive, Inc. v. Johnston*, No. 16-cv-03404-BLF, 2018 U.S. Dist. LEXIS 184300, at \*22 (N.D. Cal. Jan. 22, 2018) (finding fourth factor neutral where court had discretion to tailor damages).

### 4.  Factor V: Possibility of Factual Dispute

Turning to the fifth *Eitel* factor, the Court considers the possibility of dispute as to any material facts in the case. Since Plaintiff's factual allegations are presumed true and Defendant has failed to obtain substitute counsel and oppose the default judgment motion, no factual disputes have been identified that would preclude the entry of default judgment. This factor, therefore, favors the entry of default judgment.

### 5.  Factor VI: Reason for Default

The sixth *Eitel* factor considers the possibility that a defendant's default resulted from excusable neglect. Here, Defendant was properly served in this case and even filed an Answer (albeit one that was later stricken). ECF No. 5. The record indicates Defendant was also served with the instant default judgment motion via Defendant's registered agent for service of process. ECF No. 18-4 at 2. The Court finds this factor weighs in favor of granting default judgment. *See SEC v. Blockvest, LLC*, No. 18CV2287-GPB(MSB), 2020 U.S. Dist. LEXIS 154988, at \*9 (S.D. Cal. Aug. 26, 2020) (defendant's default was not due to excusable neglect where defendant was properly served and filed an answer); *H.I.S.C. v. Franmar Int'l Imps.*, No. 3:16-cv-00480-BEN-WVG, 2018 U.S. Dist. LEXIS 238405, at \*6 (S.D. Cal. Apr. 4, 2018) ("[A] court may find excusable neglect to be lacking where a defendant was properly served with the complaint and notice of default judgment.").

### 6.  Factor VII: Policy Favoring Merits Decision

The seventh and last *Eitel* factor emphasizes the general rule that "[c]ases should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. However, "this preference, standing alone, is not dispositive." *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) (internal quotation marks omitted). In the present case, although Defendant appeared, it has since failed to retain new counsel

despite repeated opportunities to do so. Under these circumstances, the seventh *Eitel* factor "does not preclude the Court from entering default judgment against the Defaulting Defendants." *Staniforth v. Total Wealth Mgmt., Inc.*, No. 14-cv-1899-GPC-JLB, 2023 U.S. Dist. LEXIS 98640, at *21 (S.D. Cal. June 2, 2023); *see SEC v. Blockvest, LLC*, No. 18CV2287-GPB(MSB), 2020 U.S. Dist. LEXIS 154988, at *9 (S.D. Cal. Aug. 26, 2020).

### 7.    Summary of Eitel Factors

For the above reasons, the Court grants Plaintiff's Motion for Default Judgment, with respect to Claims 1, 2, 3, 4, 6 and 7. The Court denies Plaintiff's Motion with respect to Claim 5.

## C.    Relief Requested

The Court turns next to Defendant's request for relief. Pursuant to Rule 54 of the Federal Rules of Civil Procedure, the remedies sought in a default judgment motion "must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). Here, Defendant seeks: (1) $11,997,000 in civil penalties; (2) declaratory relief; (3) injunctive relief; (4) $34,465 in attorneys' fees; and (5) $968.52 in costs. ECF No. 18-1 at 21–26. This is consistent with the relief requested in the Complaint. Compl. ¶ 215.

### 1.    Civil Penalties

The CWA provides for civil penalties "not to exceed [$66,712] per day for each violation" payable to the U.S. Treasury. 33 U.S.C. § 1319(d); 40 CFR § 19.4, Table 1 (adjustment of civil monetary penalties for inflation). "If a district court finds a violation, then civil penalties under 33 U.S.C. § 1319(d) are mandatory." *Sw. Marine, Inc.*, 236 F.3d at 1001. The Court "has discretion to set the amount of a penalty (up to the statutory maximum)[.]" *Id.*

///

///

///

///

In determining the amount of civil penalties to impose:

> [T]he court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

33 U.S.C. § 1319(d). "Courts employ a variety of methods for exercising their discretion in calculating a civil penalty under the CWA." *Californians v. Kernen Constr. Co.*, No. 4:20-cv-01348 YGR, 2021 U.S. Dist. LEXIS 86674, at *9 n.2 (N.D. Cal. May 2, 2021). Two commonly used methods are the top-down and bottom-up approaches. *See United States v. Bayley*, No. 3:20-cv-05867-DGE, 2023 U.S. Dist. LEXIS 73018, at *26–27 (W.D. Wash. Apr. 26, 2023). "The top-down approach calculates the maximum penalty allowed by the CWA and then adjusts downward based on the statutory penalty factors[.]" *Id.* (internal quotation marks omitted). "The bottom-up approach begins by calculating the economic benefit of noncompliance and then adjusts upward based on the statutory penalty factors[.]" *Id.* (internal quotation marks omitted).

As Defendant has not meaningfully participated in this litigation, the Court lacks any information as to what economic benefit Defendant may have derived from noncompliance. For these reasons, the Court adopts the top-down approach. *See L.A. Waterkeeper v. A & A Metal Recycling, Inc.*, No. CV-15-4326-MWF (JEMx), 2015 U.S. Dist. LEXIS 156792, at *18 (C.D. Cal. Nov. 18, 2015) (adopting top-down approach in calculating civil penalties in default judgment context).

Here, Plaintiff requests that the Court impose $11,997,000 in penalties, for 3,999 violations of the CWA, at $3,000 per violation, broken down as follows:

| Claim | Number of Violations | Calculation Method | Civil Penalty Amount |
|---|---|---|---|
| Claim 1: Failure to Maintain Coverage | 163 | Calculated daily from October 30, 2023 to February 27, 2024 | $489,000 |

| Claim | Number of Violations | Calculation Method | Civil Penalty Amount |
|---|---|---|---|
| Claim 2: Violation of Discharge Prohibitions | 157 | Based on number of days during which precipitation was recorded in the region at or above .1 inches | $471,000 |
| Claim 3: Violation of Effluent Limitations | 4 | For exceeding benchmarks for iron and N+N on March 28, 2022, and iron and zinc on December 11, 2022 | $12,000 |
| Claim 4: SWPPP Deficiencies | 1,825[7] | For daily violations within five-year period preceding the 60-day notice period | $5,475,000 |
| Claim 5: MIP Deficiencies | 1,825 | For daily violations within five-year period preceding the 60-day notice period | $5,475,000 |
| Claim 6: Failure to Monitor | 20 | For failure to collect four samples during each reporting period from 2018 to 2023 | $60,000 |
| Claim 7: Failure to Report | 5 | For erroneous certification of Annual Reports for past five years | $15,000 |
| **Totals** | **3,999** | | **$11,997,000** |

ECF No. 18-1 at 9–10, 12, 15–18, 24. The statutory maximum amount of penalties the Court *could* impose for 3,999 violations of the CWA is $266,781,288.

        *a.*    *Statutory Factors*

    Looking to the statutory factors, Defendant's violations for the discharge of storm

---

[7]     "In citizen enforcement actions the five-year statute of limitations period is tolled sixty days before the filing of the complaint, to accommodate the statutorily-mandated sixty-day notice period." *Sierra Club*, 834 F.2d at 1524.

water containing pollutants are serious, warranting a $3000 per violation penalty. *See Californians v. Kernen Constr. Co.,* No. 4:20-cv-01348 YGR, 2021 U.S. Dist. LEXIS 86674, at *13 (N.D. Cal. May 2, 2021). Nevertheless, the remainder of Defendant's violations—arising from a failure to implement adequate plans, technologies, monitoring, and other preventative procedures and mechanisms—are less grave. *Id.* The Court will lower the penalty for these failures to $1500 per violation, noting that the *total* amount of penalties still reflects the seriousness of Defendant's non-compliance. *Inland Empire Waterkeeper v. Corona Clay Co.*, No. 8:18-cv-00333 DOC (DFM), 2024 U.S. Dist. LEXIS 1258, at *6 (C.D. Cal. Jan. 2, 2024) (lowering penalty to $150 for violations arising "out of Defendant's failure to implement plans, technologies, monitoring, and other preventative procedures and mechanisms required by the CWA, and to comply with related reporting requirements."); *Californians,* 2021 U.S. Dist. LEXIS 86674, at *13 (lowering penalty to $50 and $500 per violation for "defendants' undisputed failure to implement plans, technologies, monitoring, and other preventative procedures and mechanisms required by the CWA and General Permit, and to comply with related reporting requirements.").

Turning to the other statutory factors, because Defendant has not meaningfully litigated this action, the Court does not have information regarding the economic benefits (if any) Defendant derived from its violations or any economic impact the penalty would have on Defendant. These factors do not justify a further reduction. *See Cal. Sportfishing Prot. All. v. Callaway*, No. 2:12-cv-0843 JAM CKD, 2012 U.S. Dist. LEXIS 116719, at *4 (E.D. Cal. Aug. 17, 2012) ("Because defendant has not responded to the complaint, the court has no evidence before it regarding economic benefit resulting from the violations, good faith efforts to comply, the economic impact of the penalty on defendant or any other evidence favoring a reduction of the penalty.").

Finally, there is no evidence of Defendant's good faith efforts to comply with the applicable requirements. On July 19, 2021, representatives of the San Diego Water Board and City of Escondido inspected the Aztec Facility and noted several violations of the

CWA and General Permit. Compl. ¶ 126; ECF No. 18-3 at 2–28. A Facility Inspection Report was prepared that included recommendations as to how Defendant could take corrective action. ECF No. 18-3 at 6–7. Despite this, storm water samples taken by Plaintiff afterwards on March 28, 2022 and December 11, 2022 still showed that the Aztec Facility was in violation of the General Permit. ECF No. 1-2 at 8. This factor does not justify any additional reduction.

### b.    Other Reductions

The Court makes the following additional modifications to Plaintiff's calculation of civil penalties:

- <u>Claim 1</u>: Plaintiff requests that penalties for Claim 1 be calculated based on the number of days between October 30, 2023 and February 27, 2024. ECF No. 18-1 at 9. The number of days between October 30, 2023 and February 27, 2024 is 120, however, not 163. The Court reduces the number of violations for Claim 1 to 120.

- <u>Claim 2</u>: Plaintiff requests that penalties for Claim 2 be based on the number of days during which precipitation was recorded in the region at or above .1 inches. ECF No. 18-1 at 10. However, because the CWA "provides for relief for unlawful discharge, the appropriate measure [for civil penalties] is the number of days when [plaintiff] had data to prove [defendant's] unlawful discharge." *Coastal Environmental Rights Foundation v. National Steel & Metals, Inc.*, Case No. 3:16-cv-00291-CAB-JLB, (S.D. Cal. Aug. 10, 2016), ECF No. 18-3 at 58; *L.A. Waterkeeper*, 2015 U.S. Dist. LEXIS 156792, at *22–23 (reducing number of violations to "number of dates that Plaintiff provided sampling data demonstrating that Defendants' storm water discharges exceeded EPA Benchmarks"). Because Plaintiff possesses sampling data for two days—March 28, 2022 and December 11, 2022—the Court reduces the number of violations to two.

- <u>Claim 3</u>: Plaintiff requests that penalties for Claim 3 be calculated for each time Defendant exceeded EPA benchmarks: for iron and N+N on March 28, 2022 and for iron and zinc on December 11, 2022. With respect to the General Permit's effluent limitations, "NAL exceedances alone do not constitute violations of the General

Permit[.]" *Waterkeeper*, 702 F. Supp. 3d at 921. Rather, "a defendant's alleged failure to comply with EPA benchmarks or NALs is relevant to assessing whether their treatment measures achieve BAT and BCT standards." *Id.* at 921; *see Baykeeper*, 619 F. Supp. 2d at 944. Consequently, the Court "declines to hold Defendants responsible for each and every pollutant that exceeded EPA Benchmarks on the same day as separate violations because it would be unfair to penalize Defendants repeatedly for what the Court considers to be a single act (*i.e.*, failure to implement adequate BMPs)." *L.A. Waterkeeper*, 2015 U.S. Dist. LEXIS 156792, at *23. The Court reduces the number of violations with respect to Claim 3 from four to two.

- **Claim 5**: The Court did not enter default judgment in Plaintiff's favor, and will not impose civil penalties, as to Claim 5.

### c. Summary

For the reasons stated, the Court imposes civil penalties in the total amount of $2,967,000, broken down as follows:

| Claim | Number of Violations | Per Violation Penalty | Civil Penalty Amount |
|-------|-----------------------|------------------------|----------------------|
| Claim 1: Failure to Maintain Coverage | 120 | $1,500 | $180,000 |
| Claim 2: Violation of Discharge Prohibitions | 2 | $3,000 | $6,000 |
| Claim 3: Violation of Effluent Limitations | 2 | $3,000 | $6,000 |
| Claim 4: SWPPP Deficiencies | 1,825 | $1,500 | $2,737,500 |
| Claim 5: MIP Deficiencies | N/A | N/A | N/A |
| Claim 6: Failure to Monitor | 20 | $1,500 | $30,000 |

| Claim 7: Failure to Report | 5 | $1,500 | $7,500 |
| Totals | 1974 | | $2,967,000 |

This amount is consistent with the range of penalties imposed by courts in other CWA cases. *See Sw. Marine, Inc.*, 236 F.3d at 1002 (affirming imposition of $799,000 in penalties assessed at $1,000 per violation for 799 violations); *Californians*, 2021 U.S. Dist. LEXIS 86674, at *12 (imposing $2,087,750 in penalties assessed at $50-$10,000 per violation for 9,641 violations); *Coastal Environmental Rights Foundation*, ECF No. 10 at 56, 59 (imposing $3,177,000 in penalties assessed at $3,000 per violation for 1059 violations); *L.A. Waterkeeper*, 2015 U.S. Dist. LEXIS 156792, at *23 (imposing $4,764,000 in penalties for 1,588 violations).

### 2. Declaratory Relief

Plaintiff requests that the Court declare "Defendant to have violated and to be in violation of the [General Permit] and Section 301(a) of the CWA, 33 U.S.C. §1311(a)." ECF No. 18-1 at 21. "The granting of declaratory relief rests in the sound discretion of the [] court exercised in the public interest." *Nat. Res. Def. Council, Inc. v. United States EPA*, 966 F.2d 1292, 1299 (9th Cir. 1992) (internal quotation marks omitted). "Declaratory relief is appropriate '(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Guerra v. Sutton*, 783 F.2d 1371, 1376 (9th Cir. 1986) (quoting *Bilbrey v. Brown*, 738 F.2d 1462, 1470 (9th Cir. 1984)).

Here, Plaintiff has not provided an explanation as to how declaratory relief would serve a useful purpose or clarify any issues not already addressed by its substantive claims. *See Minn. Life Ins. Co. v. Philpot*, No. 11cv00812 BTM (POR), 2012 U.S. Dist. LEXIS 139595, at *32 (S.D. Cal. Sep. 27, 2012) ("When claims for declaratory relief are duplicative of other claims, then declaratory relief is therefore unnecessary and redundant."); *Ricon v. Recontrust Co.*, No. 09cv937-IEG-JMA, 2009 U.S. Dist. LEXIS

67807, at *17 (S.D. Cal. Aug. 4, 2009) (rejecting declaratory judgment claim where Plaintiff offered "no reasons to believe declaratory judgment will resolve any issues aside from those already addressed by the substantive claims"); *Sanchez v. United States Bancorp*, No. 09-CV-00718-IEG (JMA), 2009 U.S. Dist. LEXIS 89752, at *20 (S.D. Cal. Sep. 25, 2009) (same). For these reasons, the Court denies Plaintiff's request for declaratory relief.

### 3.    Permanent Injunctive Relief

Plaintiff requests that the Court enter an injunction "requiring Defendant's compliance with the [General Permit]'s Effluent Limitation V.A and Receiving Water Limitation VI.A." ECF No. 18-1 at 21. The CWA authorizes a district court to order injunctive relief "to impel future compliance with the Act[.]" *Friends of the Earth*, 528 U.S. at 173. "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156 (2010). Under this test, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 156–57. A district court "has broad latitude in fashioning equitable relief when necessary to remedy an established wrong." *Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994).

Federal Rule of Civil Procedure 65(d) requires that any injunction "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d); *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1132 (9th Cir. 2006) ("If an injunction does not clearly describe prohibited or required conduct, it is not enforceable by contempt.") (internal quotation marks omitted). Here, Plaintiff's request is comparable to an "obey-the-law" injunction that does "little more than order [Defendant] to obey the law." *SEC v.*

*Goble*, 682 F.3d 934, 949 (11th Cir. 2012). Although the Ninth Circuit has not categorically "adopted a rule against 'obey the law' injunctions per se," *FTC v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012), the language of an injunction must still "be reasonably clear so that ordinary persons will know precisely what action is proscribed," *Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*, 859 F.2d 681, 685 (9th Cir. 1988) (internal quotation marks omitted).

Plaintiff's proposed injunction does not meet this standard. The proposed injunction does not describe what specific acts Defendant is required to do or refrain from doing beyond compliance with the General Permit. Plaintiff's request is also not "tailored to remedy the specific harm alleged." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). The proposed injunction is not limited to the Aztec Facility at issue in the Complaint. It also mandates that Defendant comply with the General Permit's Receiving Water Limitation VI.A, even though Plaintiff did not assert a claim alleging Defendant violated this limitation.

For these reasons, the Court denies Plaintiff's request for injunctive relief. *See Su v. Fillet*, No. 23-cv-00167-SK, 2023 U.S. Dist. LEXIS 236211, at *30 (N.D. Cal. Oct. 12, 2023) ("[T]he Court declines to enjoin Defendants from future violations of ERISA."); *Roman v. MSL Capital, LLC*, No. EDCV 17-2066 JGB (SPx), 2019 U.S. Dist. LEXIS 114803, at *12 (C.D. Cal. July 9, 2019) (denying request for permanent injunction "to prevent future violations of the fair housing laws by Defendants"), *aff'd*, 820 F. App'x 592, 593 (9th Cir. 2020); *see also Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1531–32 (11th Cir. 1996) (vacating injunction requiring defendants not to discharge storm water into the waters of the United States from its development property "if such discharge would be in violation of the Clean Water Act").

### 4. Attorney's Fees and Costs under the CWA

Plaintiff requests $34,465 in attorney's fees and $968.52 in costs incurred litigating this suit. ECF No. 18-1 at 25–26.

///

Section 505(d) of the CWA provides that:

> The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate.

33 U.S.C. § 1365(d); *see Saint John's*, 574 F.3d at 1058. "In order to award attorney's fees under § 1365(d), a district court must make two findings." *Id.* "First, it must find that the fee applicant is a 'prevailing or substantially prevailing party.'" *Id.* "Second, it must find that an award of attorney's fees is 'appropriate.'" *Id.*

Turning to the above factors, the Court concludes Plaintiff is a prevailing or substantially prevailing party in this action. "[T]he threshold for sufficient relief to confer prevailing party status is not high." *Id.* at 1059. "'If the plaintiff has succeeded on any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit, the plaintiff has crossed the threshold to a fee award of some kind.'" *Id.* (quoting *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789 (1989)). Here, Plaintiff successfully obtained a default judgment and the imposition of civil penalties against Defendant for violations of the General Permit and CWA.

An award of attorney's fees is also appropriate in this case. A "district court may deny attorney's fees to a prevailing plaintiff under § 1365(d) only where there are special circumstances" and a denial of fees on this basis is "extremely rare." *Id.* at 1064. The Court does not find this is a case presenting the type of special circumstances that would warrant a denial of fees. *See Resurrection Bay Conservation All. v. City of Seward*, 640 F.3d 1087, 1092–93 (9th Cir. 2011) (collecting cases where special circumstances precluded an award of attorneys' fees).

The remaining question before the Court, then, is whether the fees and costs Plaintiff seeks are reasonable and properly supported.

///

///

a.    *Attorneys' Fees*

In the Ninth Circuit, district courts "have a *duty* to ensure that claims for attorneys' fees are reasonable and a district court does not discharge that duty simply by taking at face value the word of the prevailing party's lawyer for the number of hours expended on the case[.]" *Vogel v. Harbor Plaza Ctr., LLC*, 893 F.3d 1152, 1160 (9th Cir. 2018) (internal quotation marks and citation omitted). "In a case in which a defendant fails to appear or otherwise defend itself . . . the burden of scrutinizing an attorney's fee request—like other burdens—necessarily shifts to the court." *Id.*; *see Currie v. Shaw*, No. 13-cv-1515, 2014 U.S. Dist. LEXIS 96076, at *5–6 (D. Or. June 6, 2014) ("Even absent objections from the opposing party, as in a default-judgment case, the court has an independent duty to review a fee petition for reasonableness.").

Here, Plaintiff seeks $34,465 in attorneys' fees, broken down as follows:

| Timekeeper | Year | Rate Requested | Hours Worked | Total |
|---|---|---|---|---|
| Livia Borak Beaudin | 2009 | $650 | 28.2 | $18,330 |
| Natalie Clagett | | $350 | 46.1 | $16,135 |
| | | | | **$34,465** |

Declaration of Livia B. Beaudin ("Beaudin Decl.," ECF No. 18-2) ¶¶ 13–15; 18-3 at 36–37. The Court assesses the reasonableness of Defendant's fees requests using the "lodestar" method, whereby the Court multiplies "the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008) (internal quotation marks omitted); *see, e.g.*, *Vogel*, 893 F.3d at 1160 n.4 ("For more than 30 years, the lodestar approach has been used by district courts across the country to calculate reasonable attorney's fee awards in cases that result in default judgments.").

The Court begins with the reasonableness of the rates charged by Plaintiff's attorneys. Reasonable attorneys' fees are calculated according to "the prevailing market rates in the relevant community[.]" *Blum v. Stenson*, 465 U.S. 886, 895 (1984); *see*

*Camacho*, 523 F.3d at 979 ("Generally, when determining a reasonable hourly rate, the relevant community is the forum in which the district court sits."). Here, Ms. Beaudin and Ms. Clagett's requested rates of $650 and $350 are commensurate with the rates found reasonable by courts in this District for attorneys of similar experience levels. *See, e.g.*, *Soler v. Cty. of San Diego*, No. 14-cv-2470-MMA-RBB, 2021 U.S. Dist. LEXIS 114484, at *15 (S.D. Cal. June 18, 2021) ("[C]ourts in this District have awarded hourly rates for work performed in civil cases by attorneys with significant experience anywhere in range of $550 per hour to more than $1000 per hour.") (collecting cases); *Kinder v. Woodbolt Distrib., LLC*, No. 18-cv-2713-DMS-AGS, 2021 U.S. Dist. LEXIS 64275, at *26 (S.D. Cal. Apr. 1, 2021) (adopting as reasonable rates between $345 to $745 per hour for associate attorneys).

The Court also finds the number of hours expended by Plaintiff's attorneys reasonable. Plaintiff's attorneys undertook numerous tasks in this case, including investigating the Aztec Facility and its impact on local waterways, collecting the information necessary to initiate this action, drafting the notice of intent to sue letter, and preparing and filing the complaint, request for entry of default, and default judgment motion. ECF No. 18-1 at 25; *see* Docket. The total number of hours expended is reasonable for these tasks.[8]

For the above reasons, the Court grants Plaintiff's request for attorneys' fees in the amount of $34,465.

### b.   Costs

Attorneys are entitled to recover "those out-of-pocket expenses that would normally be charged to a fee paying client." *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (internal quotation marks omitted). Here, Plaintiff seeks $968.52 in costs comprising: (1) $405 in filing fees; (2) $85.50 for service of the complaint and summons;

---

[8]   Plaintiff is also not seeking fees for work its counsel incurred on this matter prior to 2022 or any work done by its paralegals. Beaudin Decl. ¶¶ 15–16; 18-3 at 36–37.

(3) $13.02 for mailing of the 60-day notice of intent to sue letter and complaint and summons; and (4) $190 and $275 in lab testing for sampling and analysis of Defendant's storm water discharges. ECF No. 18-1 at 26; Beaudin Decl. ¶ 15. The Court grants the request for costs as reasonable in this case.

## CONCLUSION

For the above reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for default judgment. Specifically:

1.  The Court **GRANTS** default judgment in Plaintiff's favor and against Defendant with respect to Claims 1, 2, 3, 4, 6 and 7. The Court **DENIES** default judgment with respect to Claim 5.

2.  The Court **GRANTS IN PART** Plaintiff's request for civil penalties. Defendants shall pay $2,967,000 in civil penalties pursuant to Section 309(d) of the CWA. This payment shall be made to the U.S. Treasury within one hundred and twenty (120) days from the date of this Order.

3.  The Court **DENIES** Plaintiff's request for declaratory relief.

4.  The Court **DENIES** Plaintiff's request for injunctive relief.

5.  The Court **AWARDS** Plaintiff attorneys' fees in the amount of $34,465.

6.  The Court **AWARDS** Plaintiff costs in the amount of $968.52.

7.  The Clerk of Court is **DIRECTED** to enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

Dated: October 16, 2024

_____
Hon. Robert S. Huie
United States District Judge

24-cv-385-RSH-SBC